# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK BERG, I SPINE LLC, STEPHEN CICHY, JEFFREY DUNKEL, GERARD GIRASOLE, M.D., MISKE INVESTMENTS, LLC, LIGHTHOUSE HOLDINGS II, LLC, ANDREW SHEPHERD, and THOMAS WASCHER, M.D., | ) ) ) ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2025-0212-LWW |
| | ) | |
| TITAN SPINE, INC., THOMAS KEENE, PETER ULLRICH, M.D., RAGAN CHENEY, and KEVIN GEMAS, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 9, 2026
Date Decided: June 30, 2026

Thomas A. Uebler & Adam J. Waskie, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Steven Hart & Sean O'Malley, HART MCLAUGHLIN & ELDRIDGE LLC, Chicago, Illinois; *Counsel for Plaintiffs Mark Berg, I Spine LLC, Stephen Cichy, Jeffrey Dunkel, Gerard Girasole, M.D., Miske Investments, LLC, Andrew Shepherd, and Thomas Wascher, M.D.*

David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; David R. Marshall & Amanda M. Mills, FREDRIKSON & BYRON, P.A., Minneapolis, Minnesota; *Counsel for Defendant Titan Spine, Inc.*

David B. Anthony, BERGER MCDERMOTT LLP, Wilmington, Delaware; Brooks F. Poley & Lisa B. Ellingson, WINTHROP & WEINSTINE, P.A., Minneapolis, Minnesota; *Counsel for Defendants Peter Ullrich, M.D., Ragan Cheney, and Kevin Gemas*

Elena C. Norman & Jason W. Rigby, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Matthew Splitek, QUARLES & BRADY LLP, Madison, Wisconsin; *Counsel for Defendant Thomas Keene*

**WILL, Vice Chancellor**

In this action, former executives and early investors of Titan Spine, Inc. claim they were defrauded by the company's founders and board of directors. The plaintiffs challenge the reduction of their contractual royalty payments and a stock offering that allegedly concealed an impending merger.

Rather than sue in Delaware, the plaintiffs spent years litigating in Wisconsin state court. They persisted in that forum after the defendants invoked a Delaware forum selection clause in the merger letters of transmittal. It was not until the Wisconsin court enforced the forum selection clause that the plaintiffs refiled here—years after the statute of limitations expired.

The defendants move to dismiss the claims as time-barred. I agree. The plaintiffs were on inquiry notice of their claims by 2019 but did not bring this action until 2025. They cannot invoke the relation back doctrine because it does not apply to the Wisconsin suit. Nor can they invoke the Delaware Savings Statute because their delay resulted from a strategic choice to sue in the wrong forum. The defendants' motion to dismiss is granted.

1

## I.    BACKGROUND

The following facts are drawn from the Verified Amended Complaint (the "Complaint"), documents incorporated by reference, and matters subject to judicial notice.[1]

### A.    Titan Spine's Early Growth

Defendant Titan Spine, Inc. (the "Company") was a medical device company that developed titanium spinal implants.[2] Defendants Peter Ullrich, M.D. and Kevin Gemas co-founded the Company in 2006.[3] Ullrich served as the Company's Chief Executive Officer, and Gemas served as its President.[4] The plaintiffs are former executives, consultants, and investors who acquired Titan stock during the Company's formative years.[5]

---

[1] Confidential Verified Am. Compl. (Dkt. 30) ("Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]"); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute[]" (citation omitted)), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE).

[2] Am. Compl. ¶ 25. Titan Spine was a Delaware corporation with its principal place of business in Mequon, Wisconsin. *Id.* ¶ 15.

[3] *Id.* ¶¶ 16, 18, 27.

[4] *Id.* ¶ 27.

[5] *Id.* ¶¶ 6-14.

Titan grew steadily over the next decade, reaching $63 million in annual revenues by 2016.[6] In 2016 and early 2017, Titan raised $15 million from Southlake Equity Group, LLC ("SEG")—a Texas-based private equity firm—in exchange for a 12.3% stake in the Company.[7] In connection with SEG's investment, Titan established a formal Board of Directors (the "Board") composed of Ullrich, Gemas, and defendant Thomas Keene—SEG's managing partner.[8]

### B. The 2008 Royalty Agreements

In 2007, plaintiff Gerard Girasole, M.D.—an orthopedic surgeon—became a Titan consultant.[9] On March 6, 2008, he and Titan executed a royalty agreement entitling him to "royalties equal to one and one-half percent (1.5%) of Titan's Net Revenues from patented Girasole Inventions sold by Titan[.]"[10]

In October 2008, plaintiff Thomas Wascher, M.D.—a neurosurgeon and member of Titan's scientific advisory board—signed a substantially identical agreement with Titan (with Girasole's agreement, the "2008 Royalty

---

[6] *Id.* ¶ 41.

[7] *Id.* ¶¶ 17, 48.

[8] *Id.* ¶ 49.

[9] *Id.* ¶¶ 10, 33.

[10] Am. Compl. Ex. A § 10.2; Am. Compl. ¶ 33.

Agreements").[11]   Unlike the 1.5% royalties promised to Girasole, Wascher's agreement entitled him to a 1.0% royalty on net revenues from his inventions.[12]

Under both agreements, royalty payments would "continue so long as the Consultant Invention [was] being sold by Titan."[13] If Titan assigned its obligations to a third party, that third party was required to assume the agreements' terms.[14]

Over the next several years, Wascher and Girasole received royalties for their contributions to Titan's "Endoskeleton" product lines.[15]

## C.    The nanoLOCK Royalties

In 2015, Titan launched "nanoLOCK," a surface treatment designed to improve bone adhesion.[16]   Titan applied the technology to its Endoskeleton products.[17]  By late 2016, nanoLOCK became Titan's primary revenue driver.[18]

On December 13, 2016, Titan's Board passed a resolution reducing royalty payments on products using nanoLOCK technology by 33%.[19]   Wascher and

---

[11] Am. Compl. ¶¶ 34, 37; *see* Am. Compl. Ex. B.

[12] Am. Compl. Ex. B § 10.2.

[13] *Id.* § 10.5; Am. Compl. Ex. A § 10.5.

[14] Am. Compl. Ex. A § 10.5; Am. Compl. Ex. B § 10.5.

[15] Am. Compl. ¶¶ 36-37.

[16] *Id.* ¶¶ 4, 56.

[17] *Id.* ¶ 60.

[18] *Id.* ¶ 56.

[19] *Id.* ¶ 60.

Girasole were negatively affected by the resolution, which reduced their royalty payments on these products to 0.67% and 1.0%, respectively.[20] They had no contemporaneous knowledge of the resolution.[21]

### D.     Early Acquisition Discussions

In 2016, Ullrich began exploring a sale of Titan.[22] He solicited interest from medical technology companies including Medtronic PLC.[23] Preliminary discussions with Medtronic began in March 2016 but did not progress at that time.[24]

Titan and Medtronic reengaged in October 2017.[25] Titan publicly framed these conversations as negotiations for a prospective "distribution deal."[26]

Over the ensuing weeks, the parties met to discuss potential deal structures and contingent milestone payments.[27] Negotiations stalled again in January 2018 when the parties were unable to "bridge the gap between [Medtronic's] valuation model and [Titan's] purchase price expectations[.]"[28]

---

[20] *Id.* ¶¶ 61, 63-64.

[21] *Id.*

[22] *Id.* ¶ 54.

[23] *Id.*

[24] *Id.*

[25] *Id.* ¶ 65.

[26] *Id.* ¶ 67.

[27] *Id.*

[28] *Id.* ¶ 70.

### E. The Purported IPO Preparations

During the discussions with Medtronic, Ullrich and other Titan executives denied that the Company was for sale.[29] Instead, the Board indicated to employees and investors that Titan was pursuing an initial public offering (IPO).[30]

Titan took steps consistent with IPO preparations, including converting from a Delaware limited liability company to a Delaware corporation.[31] As part of this conversion, SEG's Class D membership units became Series A Preferred shares that were entitled to a double return on investment if Titan were acquired.[32]

### F. The Series B Offering

In June 2018, Ullrich met with Medtronic representatives to discuss the potential sale.[33] Conversations centered on whether Titan would receive a pending Medicare designation, which could increase the Company's value.[34] In August, Titan's application was denied.[35] Acquisition and pricing discussions continued.[36]

---

[29] *Id.* ¶¶ 71-72.

[30] *Id.* ¶ 73.

[31] *Id.* ¶¶ 73-74.

[32] *Id.* ¶ 74.

[33] *Id.* ¶ 76.

[34] *Id.* ¶¶ 70, 76-79.

[35] *Id.* ¶¶ 77-78.

[36] *Id.* ¶¶ 79-81.

On August 31, 2018, Titan sent stockholders—including the plaintiffs—a confidential private placement memorandum for a $20 million offering of Series B Preferred stock at $8.25 per share (the "Series B Offering").[37] Although the offering was described as a means to grow Titan before an IPO, Series B shares guaranteed a 100% return on investment above any merger consideration.[38]

The private placement memorandum allowed stockholders to subscribe for shares up to their pro rata ownership interests and to request additional shares in the event of undersubscription.[39] It did not mention the negotiations with Medtronic.[40] Unaware of the merger discussions, the plaintiffs either invested nominal sums or declined to participate in the offering.[41]

Some acquisition rumors surfaced while the Series B offering was open.[42] To address them, Ullrich sent a September 18, 2018 memorandum to Titan employees that stated "Titan [was] not running any processes currently to become acquired

---

[37] *Id.* ¶ 82.

[38] *Id.* ¶¶ 1, 83-84.

[39] *Id.* ¶ 82.

[40] *Id.* ¶¶ 86-87.

[41] *Id.* ¶ 88.

[42] *Id.* ¶ 89.

and/or actively seeking to be acquired."[43]   Yet Ullrich continued to meet with Medtronic in September, October, and November.[44]

The subscription period closed on October 31, 2018.[45]   A total of $17 million was raised; over 95% of those funds came from Ullrich, two of his friends, and SEG.[46]   SEG oversubscribed by $13 million, which was possible due to the plaintiffs' undersubscription.[47]

## G.    The Letter of Intent

On November 5, 2018, Ullrich met with Medtronic executives.[48]   Three days later, Medtronic submitted a letter of intent to purchase all of Titan's equity.[49]   The parties finalized a revised letter of intent on November 12.[50]

When Medtronic employees traveled to Titan for due diligence, Titan portrayed the visit as facilitating a "limited sales agency agreement."[51]   Titan omitted any mention of the letter of intent or prospective merger from its 2018 Year End

---

[43] *Id.* ¶ 90 (emphasis removed); *see also id.* ¶ 89.

[44] *Id.* ¶ 91.

[45] *Id.* ¶ 92.

[46] *Id.*

[47] *Id.* ¶ 93.

[48] *Id.* ¶ 95.

[49] *Id.* ¶ 96.

[50] *Id.* ¶ 97.

[51] *Id.* ¶ 98.

Investment Letter.[52]  This omission concealed the impending acquisition from key Titan employees.[53]

## H.     The Amended Royalty Agreements

In April 2019, Wascher and Girasole signed amendments to their 2008 Royalty Agreements (the "Amended Royalty Agreements").[54]  They did so after Titan informed them that the amendments were necessary to ensure their continued receipt of royalty payments.[55]

The Amended Royalty Agreements specified certain products subject to royalties and excluded others.[56]  They also formally ratified the reduced royalty rates for nanoLOCK products, as established in the 2016 Board resolution.[57]

## I.     The Merger

Titan and Medtronic executed a final merger agreement on May 9, 2019.[58] Titan stockholders did not learn of the acquisition until May 31, when Titan announced the merger and distributed a notice of appraisal rights.[59]  The notice

---

[52] *Id.* ¶ 100.

[53] *Id.* ¶ 99.

[54] *Id.* ¶¶ 101-09.

[55] *Id.* ¶¶ 102-03, 108.

[56] *Id.* ¶ 105; Am. Compl. Ex. C.

[57] *Id.* ¶ 105; Am. Compl. Ex. C.

[58] Am. Compl. ¶ 110.

[59] *Id.* ¶ 111.

9

revealed that Medtronic had first expressed interest in acquiring Titan on November 5, 2018.[60]

The acquisition closed a few weeks later, providing Titan stockholders with $150 million in up-front consideration, plus up to $100 million in contingent payments.[61] Series B Preferred stockholders received $34 million from the merger, and SEG received $30 million for its Series A Preferred stock.[62] Ullrich and Keene allegedly used their advance knowledge of the merger to reap outsized returns from the Series B Offering.[63]

## J. The Wisconsin Action

On July 30, 2020, former Titan employees and stockholders sued Ullrich, Keene, Titan, and Medtronic in Wisconsin state court (the "*Bryans* Suit").[64] They alleged that Titan's Board concealed years of informal discussions with Medtronic while engaged in a scheme to maximize personal profit.[65]

---

[60] *Id.*

[61] *Id.* ¶ 112.

[62] *Id.*

[63] *Id.* ¶ 113.

[64] *Id.* ¶ 123. That case is *Bryans v. Titan Spine, Inc.*, C.A. No. 2020CV004508 (Wis. Cir. Ct. Milwaukee Cty.).

[65] *Id.*

A few months later, the plaintiffs here learned of the *Bryans* Suit and began investigating their own claims.[66] In March 2022, they filed a complaint in Wisconsin state court against Titan, Keene, Ullrich, Cheney, and Gemas, advancing fraud and misrepresentation claims in connection with the Series B Offering and the Amended Royalty Agreements (the "Wisconsin Action").[67] On June 30, 2022, the defendants moved for partial summary judgment based on a Delaware forum selection clause in the letters of transmittal ("LOTs") that the plaintiffs executed in connection with the Medtronic merger.[68] In September 2024, the Wisconsin court held that the forum selection clause governed the plaintiffs' claims concerning the Series B Offering.[69]

In March 2025, Girasole and Wascher amended their pleading to add claims for breach of contract under the 2008 Royalty Agreements.[70] A few weeks later, the defendants sought to dismiss those claims based on the LOTs' forum selection clauses.[71] On July 2, 2025, the Wisconsin court granted the motion, holding that the

---

[66] *Id.* ¶¶ 124-30. The plaintiffs—all Titan stockholders—were Mark Berg, I Spine LLC, Stephen Cichy, Jeffrey Dunkel, Girasole, Miske Investments, LLC, Lighthouse Holdings II, LLC, Andrew Shepherd, and Wascher. *Id.* ¶¶ 6-14.

[67] *Id.* ¶ 131; Am. Compl. Ex. E ¶¶ 129-662; *see generally Berg v. Titan Spine*, C.A. No. 2022CV001899 (Wis. Cir. Ct. Milwaukee Cty.).

[68] Am. Compl. ¶ 131.

[69] *Id.*; Am. Compl. Ex. F.

[70] Am. Compl. ¶ 133; Am. Compl., *Berg v. Titan Spine, Inc.*, C.A. No. 2022CV001899 (Wis. Cir. Ct. Milwaukee Cty. Mar. 24, 2025) ¶¶ 41-55.

[71] Am. Compl. ¶ 133. The motion to dismiss was converted into a motion for summary judgment. *Id.*

11

royalty claims should also be litigated in Delaware in the interest of judicial economy.[72]

## K.    The Delaware Action

On February 25, 2025, the plaintiffs refiled their claims regarding the Series B Offering in this court.[73]  On July 14, 2025, they amended their complaint to add claims regarding the 2008 Royalty Agreements.[74]

The operative amended Complaint advances twelve counts.  The claims concerning the Series B Offering are for breach of fiduciary duty (Count I), fraud and intentional misrepresentation (Counts II and III), and strict liability misrepresentation under Wisconsin law (Count IV) (the "Series B Claims").[75]  The plaintiffs also allege breach of contract concerning the 2008 Royalty Agreements (Counts V and VI), as well as fraud and intentional misrepresentation (Counts VII and VIII), negligent misrepresentation (Counts IX and X), and rescission (Counts XI and XII) concerning the Amended Royalty Agreements (the "Royalty Claims").[76]

---

[72] *Id.*

[73] Dkt. 1.

[74] Dkt. 30.

[75] Am. Compl. ¶¶ 134-88.

[76] *Id.* ¶¶ 189-264.

On July 28, 2025, the defendants moved to dismiss the Complaint.[77] Following briefing,[78] I heard oral argument on March 9, 2026.[79]

## II. ANALYSIS

The defendants move to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[80] In resolving the motion, I must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party[.]"[81] I need not "accept every strained interpretation of [the plaintiffs'] allegations"[82] nor conclusory statements "unsupported by allegations of specific

---

[77] Dkt. 33.

[78] Defs.' Opening Br. in Supp. of Mot. to Dismiss (Dkt. 36) ("Defs.' Opening Br."); Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss (Dkt. 41) ("Pls.' Answering Br."); Defs.' Reply Br. in Supp. of Mot. to Dismiss (Dkt. 48) ("Defs.' Reply Br.").

[79] Dkt. 57; *see* Tr. of Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 58) ("Hr'g Tr.").

[80] Ct. Ch. R. 12(b)(6).

[81] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[82] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (citation omitted).

13

facts."[83]  Dismissal is appropriate only if the plaintiffs cannot "recover under any reasonably conceivable set of circumstances susceptible of proof."[84]

I begin my analysis with the Royalty Claims before addressing the Series B Claims.  Both sets are dismissed as time-barred.  Because the plaintiffs were on inquiry notice by 2019, the three-year limitations period expired well before this action was filed.  The plaintiffs cannot successfully invoke the relation back doctrine or the Delaware Savings Statute to excuse their delay.

## A.    The Royalty Claims

Girasole and Wascher allege that Titan breached the 2008 Royalty Agreements by reducing their royalty rates, and that the defendants fraudulently induced them to execute the Amended Royalty Agreements to ratify the reduced rates. These claims are untimely.  The plaintiffs were on inquiry notice of the alleged breaches of contract and the purported fraud by April 2019, when they signed the Amended Royalty Agreements and began receiving reduced payments.  Because the three-year limitations period expired in 2022, the claims at law are time-barred and the equitable request for rescission fails for want of a viable fraud claim.

---

[83] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999) (citation omitted), *aff'd sub nom.*, *Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[84] *Savor*, 812 A.2d at 896-97 (citation omitted).

### 1. Claim Accrual

"[E]quity follows the law, and this court will apply statutes of limitations by analogy."[85] Claims for breach of contract and for fraud are governed by a three-year limitations period.[86] The statute of limitations "starts to run when the claim accrues, and a breach of contract claim accrues 'at the time of breach[.]'"[87] Similarly, a fraud claim accrues "at the moment of the wrongful act[,]" meaning when the false "representation is made."[88]

For the breach of contract claims, the alleged breaches of the 2008 Royalty Agreements began in December 2016 when the Titan Board resolved to reduce the nanoLOCK royalty rates.[89] Even assuming a continuing breach, the final alleged breach occurred in April 2019 when Girasole and Wascher executed the Amended

---

[85] *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009), *aff'd sub nom.*, *Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLC*, 11 A.3d 228 (Del. 2011) (TABLE).

[86] 10 *Del. C.* § 8106(a); *see MKE Hldgs. Ltd. v. Schwartz*, 2020 WL 467937, at *12 (Del. Ch. Jan. 29, 2020); *Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *9 (Del. Ch. July 19, 2016).

[87] *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *11 (Del. Ch. Feb. 18, 2015) (citing *Whittington v. Dragon Gp. L.L.C.*, 2008 WL 4419075, at *5 (Del. Ch. June 6, 2008, revised Sept. 30, 2008)).

[88] *Winkelvoss Cap. Fund, LLC v. Shaw*, 2019 WL 994534, at *5 (Del. Ch. Mar. 1, 2019) (citation omitted); *see also Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *6 (Del. Ch. Jan. 27, 2010) ("The statute of limitations begins to run when a plaintiff's claim accrues, which occurs at the moment of the wrongful act and not when the effects of the act are felt.").

[89] *See supra* notes 19-20 and accompanying text.

Royalty Agreements.[90]  Those amended agreements expressly "supersede[d] any prior agreement or understanding[.]"[91]  For the fraud claims, the allegedly wrongful statements about the royalty payments were made between February 15, 2019 and April 5, 2019.[92]

Accordingly, the Royalty Claims accrued by April 2019 at the latest.  Absent tolling, Wascher and Girasole had until April 2022 to bring their claims.[93]  They did not assert their Royalty Claims in Delaware until July 2025.[94]  And though they filed fraud claims in Wisconsin in March 2022, they did not assert their breach of contract claims in any forum until March 2025.[95]

Wascher and Girasole attempt to revive their claims through tolling, Court of Chancery Rule 15(c), and the Delaware Savings Statute.  None of these efforts are fruitful.

---

[90] *See supra* notes 54-56 and accompanying text.

[91] Am. Compl. Ex. C § 2; Am. Compl. Ex. D § 2.

[92] *See* Am. Compl. ¶¶ 205, 225 (statements made on February 15, 2019); *id.* ¶¶ 207, 215, 227, 235 (correspondence dated April 1, 2019); *id.* ¶¶ 217, 237 (phone call on April 5, 2019).

[93] 10 *Del. C.* § 8106(a); *see supra* note 86 and accompanying text.

[94] *See supra* note 73 and accompanying text.

[95] *See supra* note 70 and accompanying text.

## 2. Tolling

The plaintiffs do not assert that a tolling doctrine applies to their fraud-based Royalty Claims. They do, however, argue that fraudulent concealment tolled the statute of limitations for their breach of contract claims.[96] "[T]he statute of limitations may be tolled when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth."[97] The limitations period is tolled only until the plaintiff is on inquiry notice—that is, until "such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury."[98]

The plaintiffs bear the burden of pleading that a tolling doctrine applies.[99] To demonstrate fraudulent concealment, they must allege "an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the[m] away from the truth."[100] Girasole and Wascher have not done so, failing to allege how the defendants' conduct prevented them from

---

[96] *See* Pls.' Answering Br. 39, 43-45.

[97] *MKE Hldgs.*, 2020 WL 467937, at *12.

[98] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (Del. Ch. July 17, 1998) (emphasis removed), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE).

[99] *Am. Int'l Gp.*, 965 A.2d at 812 (explaining that, where the plaintiffs' claims are "brought outside the applicable limitations period," they must "plead facts that support the existence of . . . tolling[]").

[100] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007) (citing *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987)).

discovering the purported breaches. Instead, they rely on statements by Titan representatives acknowledging the Amended Royalty Agreements would reduce royalty payments.[101] Drawing all reasonable inferences in the plaintiffs' favor, these statements do not reflect "actual artifice" to conceal the royalty reductions.[102] Rather, openly acknowledging the reduced rates would have put the plaintiffs on notice.

Even if fraudulent concealment applied, Girasole and Wascher were on inquiry notice of the reduced royalty payments by April 2019.[103] Section 1(d) of the Amended Royalty Agreements included tables making it mathematically plain that nanoLOCK royalties were reduced by 33%.[104] A cursory read of those amendments would lead a person of "ordinary intelligence and prudence" to recognize the reduction.[105] In addition, the reduction was mathematically obvious from the amounts of the royalty payments they received beginning in 2019.[106]

---

[101] Pls.' Answering Br. 43-45.

[102] *Id.* at 43.

[103] Am. Compl. ¶¶ 101-09.

[104] Am. Compl. Ex. C § 1(d); Am. Compl. Ex. D § 1(d).

[105] *Dean Witter*, 1998 WL 442456, at *7.

[106] Am. Compl. Ex. A § 10.2; Am. Compl. Ex. B § 10.2; Am. Compl. ¶¶ 105, 109.

The same logic applies to the plaintiffs' allegation that Titan failed to provide required quarterly revenue reports.[107] Girasole and Wascher acknowledge that they were entitled to receive these reports under the 2008 Royalty Agreements but did not receive them between 2016 and 2019.[108] Titan's failure to deliver the required reports constituted an immediate, observable breach.[109] Because the plaintiffs knew they were not receiving reports as late as 2019, any claim for this breach accrued by that time.

### 3. Relation Back and the Savings Statute

The plaintiffs first attempt to use Rule 15(c) to relate their 2025 breach of contract claims back to the initial 2022 complaint in the Wisconsin Action.[110] The defendants raised the inapplicability of Rule 15(c) in their opening brief.[111] But the plaintiffs made only a passing reference to the rule in their opposition brief, invoking

---

[107] Am. Compl. ¶¶ 193, 200.

[108] *See id.* ¶¶ 33, 34, 193, 200; Pls.' Answering Br. 5.

[109] *See Pulieri*, 2015 WL 691449, at *11 (noting that a breach of contract claim accrues "at the time of breach[]" (citation omitted)); *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *18 (Del. Ch. June 29, 2005) ("The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs. This is so because the plaintiffs were harmed as soon as the alleged wrongful acts occurred.").

[110] Ct. Ch. R. 15(c)(2) (providing that "[a]n amendment to a pleading relates back to the date of the original pleading when[] . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[]"). The plaintiffs do not rely on Rule 15(c) for their fraud claims, which were asserted in the original March 2022 Wisconsin complaint. They instead rely on the Savings Statute for those claims.

[111] *See* Defs.' Opening Br. 47-48.

it substantively for the first time at oral argument.[112] "Issues not briefed are deemed waived."[113]

Even if the argument were not waived, it fails on the merits. First, Rule 15(c) "only applies to the original pleading" in this court, "not to a different complaint filed in a different court, even one based on related or identical facts."[114] Second, even if the Wisconsin Action complaint constituted an "original pleading," the claims concerning the 2008 Royalty Agreements do not relate back to it.

A claim for breach of contract does not relate back if the allegations are based upon different agreements than those addressed in the original complaint.[115] The 2022 Wisconsin Action complaint alleged only fraud in connection with the Series B Offering and the Amended Royalty Agreements.[116] It did not allege a breach of the 2008 Royalty Agreements. Claims regarding the 2008 Royalty Agreements were

---

[112] *See* Pls.' Answering Br. 53-54 (making a passing reference to Rule 15(c) as it compares to the Savings Statute); Hr'g Tr. 26.

[113] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[114] *Parker v. Gadow*, 893 A.2d 964, 965, 968-69 (Del. 2006) (declining to extend Superior Court Rule 15(c) to a "separate complaint filed in a different court[]").

[115] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 2012 WL 3201139, at *18 (Del. Ch. Aug. 7, 2012) (explaining that "[a] breach of a representation in one transaction-specific contract does not 'arise' out of the same 'transaction or occurrence' as the breach of the same representation made in a different contract" (citation omitted)).

[116] *See* Am. Compl. Ex. E ¶¶ 129-662.

left unpleaded until March 2025, when Girasole and Wascher amended their Wisconsin complaint.[117] By that point, the claims were time-barred.

The plaintiffs next invoke the Delaware Savings Statute to revive their claims for fraud and breach of contract. 10 *Del. C.* § 8118 provides limited relief from the statute of limitations where a plaintiff "has filed a timely lawsuit, but is procedurally barred from obtaining a resolution on the merits."[118] The action must have been "duly commenced within the time" designated in 10 *Del. C.* § 8106(a).[119]

A plaintiff cannot rely on the Savings Statute when she purposefully avoids a Delaware forum selection clause.[120] The plaintiffs knew about the Delaware forum selection clause in the LOTs no later than June 2022, when the defendants sought partial summary judgment on that basis in the Wisconsin Action.[121] Rather than refile in Delaware, Wascher and Girasole amended their Wisconsin complaint

---

[117] *See* Am. Compl., *Berg v. Titan Spine, Inc.*, C.A. No. 2022CV001899 (Wis. Cir. Ct. Milwaukee Cty. Mar. 24, 2025) ¶¶ 41-55.

[118] *Reid v. Spazio*, 970 A.2d 176, 180 (Del. 2009).

[119] 10 *Del. C.* § 8118(a).

[120] *Tilden v. Cunningham*, 2018 WL 5307706, at *15 (Del. Ch. Oct. 26, 2018) (explaining that a plaintiff's claims were time-barred in light of a decision to file elsewhere in contravention of a Delaware forum selection clause, "because any harm [the plaintiff] . . . suffered [wa]s entirely self-inflicted[]").

[121] Am. Compl. ¶ 131. Wascher and Girasole were parties to the initial Wisconsin Complaint. *See* Am. Compl. Ex. E.

21

in 2025 to add claims about the 2008 Royalty Agreements.[122] The Savings Statute only protects a "plaintiff who, through no fault of his own, finds his cause technically barred by the lapse of time."[123] Here, the plaintiffs' tardiness was their own doing.

### 4. Rescission

Finally, the plaintiffs seek rescission of the Amended Royalty Agreements in connection with their fraud claim.[124] "Rescission is not a cause of action but a remedy available only where facts indicate [that] equity so requires."[125] Because the underlying fraud claim is time-barred, rescission is unavailable.[126]

## B. The Series B Claims

The plaintiffs' next set of claims is premised on the Series B Offering. They allege that the offering was structured "in a manner that uniquely favored the [Series B] shares in the event of an acquisition[.]"[127] These claims are also time-barred.[128]

---

[122] Am. Compl., *Berg v. Titan Spine, Inc.*, C.A. No. 2022CV001899 (Wis. Cir. Ct. Milwaukee Cty. Mar. 24, 2025).

[123] *Giles v. Rodolico*, 140 A.2d 263, 267 (Del. 1958).

[124] Am. Compl. ¶¶ 244-64.

[125] *Eni Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013).

[126] *See Kors v. Carey*, 158 A.2d 136, 143 (Del. Ch. 1960) (explaining that a contract was "not subject to rescission because there [wa]s no proof of fraud"); *see also Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982) ("[R]escission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo. Common grounds for rescission of a contract . . . include fraud, misrepresentation [or] mistake.").

[127] Am. Compl. ¶ 138.a.

[128] *Id.* ¶¶ 134-88.

### 1. Accrual of the Delaware Law Claims

A three-year statute of limitations applies to the Series B Claims brought under Delaware law.[129] The purported "wrongful act" is the Series B Offering.[130] These claims therefore accrued no later than October 31, 2018, when the subscription period ended.[131]

Even if the claims were tolled for a time, the plaintiffs were put on inquiry notice by May 31, 2019.[132] On that date, Titan publicly announced the merger with Medtronic.[133] The announcement included a notice of appraisal rights stating that Medtronic first expressed interest in acquiring Titan on November 5, 2018—just five days after the Series B Offering closed.[134]

The plaintiffs assert that the merger announcement and notice of appraisal rights did not put them on notice because they omitted to mention the earlier

---

[129] *See supra* notes 85-87 and accompanying text; *MKE Hldgs.*, 2020 WL 467937, at *12 ("The statute of limitations for both breach of contract and common law fraud is three years.").

[130] *See supra* notes 97-98 and accompanying text (explaining that a claim accrues at the time of the injury, and not when its harmful effects are felt).

[131] Am. Compl. ¶ 92.

[132] *Id.* ¶ 111. The Complaint states that two of the plaintiffs—Cichy and Dunkel—learned of the Medtronic negotiations even earlier, in November and December 2018. *Id.* ¶ 128 (alleging that Cichy "incidentally learned" of the November 2018 meeting at Medtronic's headquarters and was told by Ullrich to "keep the matter secret[,]" and that Dunkel "had been told about Medtronic's impending acquisition" in "late December of 2018").

[133] *Id.* ¶ 111.

[134] *Id.*

negotiations or explain that the IPO was a ruse to dissuade their participation in the Series B Offering.[135] They insist they first learned of the wrongdoing in October 2020, when the *Bryans* Suit was filed in Wisconsin.[136] But inquiry notice does not require actual discovery of the entire wrongful scheme; it only requires "facts sufficient" to prompt a person of "ordinary intelligence and prudence" to inquire further.[137] The sudden announcement of a nine-figure merger—mere months after Titan raised Series B funds for a purported IPO and denied seeking a buyer— was a red flag. Indeed, the Complaint describes the timing of the merger relative to the Series B Offering as "suspicious, to say the least[.]"[138] A reasonably diligent stockholder would have investigated the circumstances surrounding the Series B Offering at that time.

Accordingly, the Delaware law claims challenging the Series B Offering accrued by May 2019. The three-year statute of limitations expired in May 2022. This suit was not filed until February 25, 2025, making the claims untimely.

---

[135] *Id.* ¶ 113.

[136] *Id.* ¶¶ 124-30.

[137] *Dean Witter*, 1998 WL 442456, at *7.

[138] Am. Compl. ¶ 147 (stating that the timing was "inconsistent with the possibility that [the d]efendants did not have this material information during the Series B [O]ffering[]").

### 2. Accrual of the Wisconsin Law Claim

The plaintiffs' claim for strict liability misrepresentation under Wisconsin law concerns the September 18, 2018 memorandum sent to Titan employees that disclaimed merger discussions.[139] The defendants argue that this claim is governed by Delaware law under the Medtronic merger agreement and the LOTs.[140] I need not resolve the choice-of-law dispute, however. Even if Wisconsin law applied, the claim would be time-barred.

Wisconsin imposes a six-year statute of limitations on claims for strict liability misrepresentation.[141] The challenged statement was made on September 18, 2018, and the claim accrued at that time. The plaintiffs had until September 18, 2024 to bring their claim, but did not raise it until February 25, 2025.

### 3. The Savings Statute

The plaintiffs assert that their Series B Claims are timely due to the application of the Savings Statute.[142] As explained above, the Savings Statute is designed to protect plaintiffs who, through no fault of their own, suffer a procedural defect in a

---

[139] Am. Compl. ¶¶ 176-88.

[140] *See* Defs.' Reply Br. 26-27; *but see* Pls.' Answering Br. 23-24.

[141] *See Honeycrest Farms, Inc. v. Brave Harvestore Sys.*, 205 Wis.2d 738, 738-39 (Wis. Ct. App. 1996) (TABLE).

[142] Pls.' Answering Br. 49.

timely filed case.[143] The statute does not rescue plaintiffs who choose to file in the wrong jurisdiction in contravention of a forum selection clause.[144]

The plaintiffs litigated over the Series B Offering in Wisconsin for three years. They were on notice of the forum selection clause in the LOTs no later than June 2022, when the defendants sought partial summary judgment on that basis.[145] Even so, the plaintiffs continued to press their Series B Claims in Wisconsin until the court ruled in the defendants' favor.[146]

Under Wisconsin law, the doctrine of collateral estoppel applies where an issue was actually litigated and essential to a valid, final judgment.[147] In September 2024, the Wisconsin court held that the LOTs were valid, enforceable

---

[143] *Giles*, 140 A.2d at 267; *see supra* notes 118-120 and accompanying text.

[144] *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *12 (Del. Ch. Nov. 2, 2017) ("A party cannot rely on a suit knowingly filed in the wrong forum as a basis for avoiding the application of laches." (citation omitted)), *aff'd*, 202 A.3d 509 (Del. 2019) (TABLE); *Huffington v. T.C. Gp., LLC*, 2012 WL 1415930, at *10 (Del. Super. Apr. 18, 2012) (refusing to apply the Savings Statute where a plaintiff "decided to pay no heed to [an enforceable] forum selection clause" and instead "chose a strategy that backfired[]"); *see supra* notes 120-123 and accompanying text.

[145] Am. Compl. ¶ 131 (stating that, on June 30, 2022, the defendants argued that a "forum selection clause contained in the [LOTs] executed by the [p]laintiffs mandated that the [Series B Claims] . . . take place in Delaware[]").

[146] *Id.* ¶¶ 130-31.

[147] *See Dostal v. Strand*, 984 N.W.2d 382, 388 (Wis. 2023); *see also Acierno v. New Castle Cty.*, 679 A.2d 455, 459 (Del. 1996) ("The 'preclusive effect of a foreign judgment is measured by standards of the rendering forum.'" (citing *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1217 (Del. 1991))).

contracts supported by consideration.[148]  It also held that "the issues being litigated are subject to the forum-selection clause, requiring that th[e] action be litigated in Delaware."[149]  These holdings were essential because they formed the primary grounds for the court's entry of partial summary judgment.[150]  The plaintiffs are collaterally estopped from arguing otherwise here.

Attempting to bypass this preclusion, the plaintiffs argue that the LOTs were procured by fraud.[151]  But the plaintiffs pleaded fraud solely in connection with the Series B Offering—not the LOTs, which were sent to the plaintiffs after the merger closed.[152]

The requirements for collateral estoppel under Wisconsin law are therefore met.  The plaintiffs are barred from relitigating the force and applicability of the forum selection clause.  The plaintiffs forfeited the Savings Statute's protections when they ignored the Delaware forum selection provision.

---

[148] *See* Decision and Order, *Berg v. Titan Spine, Inc.*, C.A. No. 2022CV001899 (Wis. Cir. Ct. Milwaukee Cty. Sept. 20, 2024).

[149] *Id.*

[150] *Id.*

[151] Pls.' Answering Br. 61-62; *see* Hr'g Tr. 7.  The plaintiffs also argue that releases in the LOTs cannot waive claims for breach of fiduciary duty.  *See* Pls.' Answering Br. 61. Because their claims are dismissed as time-barred, I do not reach the defendants' argument that the claims are independently barred by the releases.

[152] *See* Am. Compl. ¶ 111; *cf. Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (explaining that a plaintiff must "allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim"); Ct. Ch. R. 9(b).

The plaintiffs maintain that they acted in good faith by continuing to litigate in Wisconsin.[153] That is irrelevant; they "chose not to sue in the contractually proper forum[.]"[154] There are also no extraordinary circumstances to excuse the plaintiffs' delay in suing in the proper forum.[155] Having "gambled and lost," they cannot shift the consequences of their strategic decisions onto the defendants.[156] Any harm they have "suffered is entirely self-inflicted."[157]

## III. CONCLUSION

The plaintiffs' claims are time-barred. The defendants' motion to dismiss is granted, and the Complaint is dismissed with prejudice.

---

[153] Hr'g Tr. 23-24; Am. Compl. ¶ 131 (contending that the plaintiffs, "in good faith, disagreed with [the defendants'] position").

[154] *Carlyle Inv. Mgmt. L.L.C. v. Nat'l Indus. Gp. (Holding)*, 2012 WL 4847089, at *11 (Del. Ch. Oct. 11, 2012), *aff'd*, 67 A.3d 373 (Del. 2013).

[155] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177-78 (Del. 2011) (explaining that "unusual conditions or extraordinary circumstances" may justify a decision not to apply the statute of limitations, and stating that the Court of Chancery may "exercise its discretion" to determine whether such conditions or circumstances apply, "after considering all relevant facts" (citation omitted)).

[156] *Tilden*, 2018 WL 5307706, at *15.

[157] *Carlyle Inv. Mgmt.*, 2012 WL 4847089, at *11; *see also Ney v. 3i Gp. PLC*, 2025 WL 1455872, at *5 (Del. Super. May 21, 2025) ("Delaware courts . . . recognize that where a litigant disregards or strategically tries to avoid an applicable forum selection clause, the Savings Statute does not apply."), *aff'd*, 351 A.3d 1003 (Del. 2025) (TABLE).

28